# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:23-cv-00279-MR-WCM

| | |
|---|---|
| RAVEN FITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| REGINA BROOKS, in her individual ) | |
| Capacity; JAMARCUS NANCE, in his ) | |
| Individual capacity; and KYLE ) | |
| ADKINS, in his individual capacity, ) | |
| ) | |
| Defendants. ) | |
| ————————————————— ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Partial

Summary Judgment [Doc. 63]; Defendant Brooks' Second[1] Motion for

Summary Judgment [Doc. 66]; and the Motion for Summary Judgment filed

by Defendants Nance and Adkins [Doc. 69].

## I.    PROCEDURAL BACKGROUND

The Plaintiff Raven Fite ("Fite" or "the Plaintiff") initiated this action on

October 2, 2023, asserting claims under 42 U.S.C. § 1983 and North

---

[1] Defendant Brooks had filed a Motion for Summary Judgment after the filing of the First Amended Complaint. [Doc. 48]. That motion was denied as moot when the Plaintiff was allowed to file a Second Amended Complaint. As such, Defendant Brooks' current motion is styled as a "Second Motion for Summary Judgment." [Doc. 66].

Carolina state law following her arrest for charges related to driving a school bus while impaired. [Doc. 1]. Fite named as defendants in their individual capacities: Regina Brooks, a school resource officer and deputy with the Cleveland County Sheriff's Office ("Deputy Brooks"); Jamarcus Nance, a trooper with the North Carolina State Highway Patrol (NCSHP) ("Trooper Nance"); and Raymond Pierce, a trooper with NCSHP and Defendant Nance's supervisor ("Trooper Pierce").

With the filing of her First Amended Complaint, Fite dismissed Trooper Pierce and added NCSHP Trooper Kyle Adkins ("Trooper Adkins") as a defendant. [Doc. 30]. As stated in her Second Amended Complaint [Doc. 60], Fite asserts the following claims:

> Count I: a § 1983 claim against Brooks, Nance, and Adkins for malicious prosecution and unlawful seizure arising from Fite's December 9, 2021 arrest;
>
> Count II: a § 1983 claim against Nance for malicious prosecution and unlawful seizure arising from the criminal proceedings instituted against Fite on December 19, 2021;
>
> Count III: a § 1983 claim against Brooks, Nance, and Adkins for failure to intervene on December 9, 2021;
>
> Count IV: a § 1983 claim against Nance for fabrication of evidence;
>
> Count V: a North Carolina state law claim for false arrest against Brooks, Nance, and Adkins arising from Fite's arrest on December 9, 2021; and

> Count VI: a North Carolina state law claim for "willful
> and wanton misconduct" against Brooks, Nance, and
> Adkins.

[Id.]. The Defendants now move for summary judgment with respect to all of the Plaintiff's claims. [Docs. 66, 69]. The Plaintiff in turn moves for the entry of a partial summary with respect to Count IV, the fabrication of evidence claim against Trooper Nance. [Doc. 63]. These motions have been fully briefed, and this matter is ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable" factfinder could render a verdict in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine

issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n. 3. The nonmoving party may not rely upon mere allegations or denials of allegations in her pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which a reasonable factfinder "could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be

4

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott, 550 U.S. at 380.

## III.    FACTUAL BACKGROUND

Viewing the parties' forecasts of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

In the fall of 2021, the Plaintiff Raven Fite was working as an assistant kindergarten teacher at Union Elementary in Shelby, North Carolina. [Doc. 48-4: Fite Dep. at 20]. Ms. Fite obtained her commercial driver's license in

5

October 2021 and began driving a bus route in the mornings and afternoons in addition to her teaching responsibilities. [Id. at 19, 21].

Deputy Brooks is a Cleveland County Sheriff's Deputy and the school resource officer for Union Elementary. [Doc. 48-2: Brooks Dep. at 18]. A few weeks prior to the incident in question, the school's vice principal reported to Deputy Brooks that she had received a complaint that Fite was drinking late at night and then operating a school bus the next day and coming to school intoxicated. [Id. at 21-23]. The vice principal also stated that some teachers had reported smelling alcohol on Fite during workdays. [Id. at 22]. Based on this report, Deputy Brooks began an investigation, visiting Fite's classroom multiple times, talking to her to at length, and speaking to her first thing in the morning on multiple occasions. [Id. at 24-25]. Deputy Brooks did not find any evidence of misconduct prior to December 9, 2021. [Id. at 25].

On December 9, 2021, Fite woke up late, around 6:30 a.m., only ten minutes before she had to be at work. [Doc. 48-4: Fite Dep. at 56-57]. She had consumed six beers the evening before, beginning around 7:00 or 8:00 p.m. and ending around 10:30 to 11:00 p.m. [Id. at 47]. She did not shower before leaving for work. [Id. at 56].

That morning, Deputy Brooks decided to follow the school bus driven by Fite following reports of a neighborhood dog boarding the bus, causing harm. [Doc. 48-2: Brooks Dep. at 51, 53]. Deputy Brooks observed four instances of Fite driving poorly. First, as Fite's bus approached Deputy Brooks' patrol car, Deputy Brooks was parked on a side road where Fite's bus was to turn. Fite waved to Deputy Brooks to move out of the way so that she could make the turn, although Deputy Brooks felt the road was wide enough for Fite to make the turn, especially as Deputy Brooks' side tires were off the road on the grass. [Id. at 89-90]. Second, Deputy Brooks observed Fite's bus make a wide turn off of Bushy Creek Road onto Kingston Road, at which time the bus crossed "all the way over" the double yellow line. [Id. at 202-03]. Third, when Fite turned right off of Kingston Road, the rear passenger side tires of the bus dropped off the road onto the shoulder, causing the bus to "jump." [Id. at 91]. Fourth, Fite signaled to turn onto a road which was not on the bus route, then cancelled her signal, proceeded to the route, and re-signaled at the appropriate turn. [Id. at 92-93]. These actions concerned Deputy Brooks, but she assumed the children were misbehaving on the bus and distracting Fite. [Id. at 94]. Deputy Brooks also admitted in her deposition that at least two of the four instances she

7

witnessed were not driving errors for which Fite could have received a citation. [Id. at 89-93].

Fite arrived back at the school at approximately 7:40 a.m. and began spraying the seats down with a cleaning solution. Thereafter, Deputy Brooks boarded Fite's bus to discuss the situation with the neighborhood dog and to see how the children on the bus had behaved, as that was what Deputy Brooks believed to be the cause of the poor driving that she observed. [Id. at 94-95]. Fite reported that the kids were "better" and did not mention that they had been especially unruly that morning. [Doc. 48-6: Bus Video at 7:42:20]. Fite was sweeping the rear of the bus when Deputy Brooks boarded. As she came towards the front of the bus, Deputy Brooks noticed the smell of alcohol coming from Fite. [Doc. 48-2: Brooks Dep. at 54]. Deputy Brooks continued to engage in conversation with Fite for several minutes, at which time she observed Fite leaning on the bus seats as if she were using them to hold herself up and slurring her speech on multiple occasions. [Id. at 54-55, 98-99; Doc. 48-6: Bus Video at 7:44:41-7:48:44]. Deputy Brooks also observed that Fite had glassy eyes. [Doc. 48-2: Brooks Dep. at 132-33]. Based on these observations, Deputy Brooks sent a text message to her supervisor asking for an officer with portable breath test ("PBT") to report to the school. [Id. at 48-49]. Deputy Brooks then asked Fite to accompany

8

her to the principal's office.  [Doc. 48-4: Fite Dep. at 64].  The remainder of Fite's interactions with Deputy Brooks are shown on Deputy Brooks' body-worn camera footage. [Doc. 48-5: Brooks Body Worn Camera Footage ("BWC")].

Once inside the principal's office, Principal Glenn informed Fite that Deputy Brooks had reported that Fite smelled of alcohol.  [Id. at 8:02:32]. In response, Fite admitted that she had drank "about six" beers the night before, beginning around 7:00-7:30 p.m. and ending around 11:00 p.m.   [Id. at 8:02:53-8:03:20; 8:04:40-8:05:01; 8:06:32-8:06:50].  Fite admitted she woke up late that morning and that she felt tired.  [Id. at 8:05:33-8:05:53; 8:06:12-8:06:18].  When Deputy Brooks asked Fite whether she felt like she may still have alcohol in her system, Fite responded, "Honestly, I don't know because I'm tired."  [Id. at 8:06:29-8:06:30].

Cleveland County Sheriff's Office Deputy Kendricks[2] arrived at the principal's office to administer a PBT at 8:07 a.m. After discussing her options regarding the breath test as it relates to her employment with the Cleveland County School System, Fite asked to speak with Principal Glenn alone, outside of the presence of law enforcement.  [Id. at 8:08:51].  Fite spoke with Glenn for over ten minutes.  [Id. at 8:08:51-8:19:11].  Once the deputies were

---

[2] Deputy Kendricks is not a defendant in this case.

called back into the office, Fite informed them that she had chosen to voluntarily resign from her position at Union Elementary School, effective immediately, explaining that she didn't want a record or to go to jail. [Id. 8:19:33-52]. Principal Glenn explained that, due to Fite's resignation with the school, the school would no longer require Fite to submit to a breath test, although Deputy Brooks and Deputy Kendricks may still be required to proceed with their investigation independent from the school's requirements. [Id. at 8:19:52-8:20-46].

Deputy Brooks informed Fite that she would be proceeding with her investigation despite Fite's resignation and explained that the next step in her investigation would be to administer a breath test, to which Fite eventually consented. [Id. at 8:20:47-8:22:37]. After realizing that Deputy Kendricks' PBT was malfunctioning, additional assistance was requested. [Id. at 8:23:57-8:24:06].

At approximately 8:40 a.m., nearly an hour after Deputy Brooks first interacted with Fite on the bus that morning, Trooper Nance and Trooper Gantt[3] with the North Carolina State Highway Patrol arrived at Union Elementary to assist with the DWI investigation. [Id. at 8:39:27]. Deputy Brooks informed the troopers of her observations that morning, including the

---

[3] Trooper Gantt is not a defendant in this case.

four separate instances of poor driving by Fite, as well as the odor of alcohol from her breath, red glassy eyes, unsteadiness on her feet, and slurred speech. [Doc. 65-1: DWI Report ("DWIR")]. Trooper Nance also noticed that Ms. Fite had a strong odor of alcohol, red/glassy eyes, and slurred speech, and that she was unsteady on her feet. [Doc. 48-3: Nance Dep. at 46, 51].

When questioned by Trooper Nance, in addition to repeating her admission of drinking six beers the night before, Fite also reported that she had taken a pill, a generic form of Benadryl, before she went to bed in order to help her sleep. [Doc. 48-5: Brooks BWC at 8:46:17-8:47:02]. Fite told Trooper Nance that she started the bus that morning around 6:55 a.m. and pulled out of the parking lot at 7:02 a.m. to begin her bus route. [Id. at 8:47:11-35]. When asked whether she thought driving the bus that morning was "the right thing to do," Fite responded, "I guess not." [Id. at 8:47:35-42].

Trooper Nance then administered a horizontal gaze nystagmus test, or "HGN" test, to Fite. [Id. at 8:49:02-8:50:35]. Trooper Nance noted that both of Fite's eyes showed lack of smooth pursuit, maximum deviation, and onset prior to 45 degrees, which indicated impairment. [Doc. 65-1: DWIR]. During her deposition, Fite admitted that her eyes were "bouncing" during the HGN test. [Doc. 48-4: Fite Dep. at 141].

Trooper Nance then administered two PBTs to Fite: the first at 8:51 a.m., and the second at 8:58 a.m.—approximately two hours after she had begun driving the bus that morning. [Doc. 48-5: Brooks BWC at 8:50:41-8:51:16; 8:58:27-40]. The results of both tests were 0.0. [Doc. 65-1: DWIR; Doc. 48-3: Nance Dep. at 69].

Despite the results of the PBTs, the officers believed that Fite continued to demonstrate signs of impairment. To investigate further, Trooper Nance and Deputy Brooks escorted Fite to a secluded parking lot at the school to conduct field sobriety tests. [Doc. 48-5: Brooks BWC at 9:00:16-9:01:00].

Trooper Nance administered two standard field sobriety tests: the one-leg-stand test and the walk-and-turn test. [Id. at 9:01:09-9:04:24]. Despite Fite's claim that she "aced the field sobriety tests without difficulty" [Doc. 60: Second Amended Complaint at ¶ 61], Trooper Nance observed at least three signs of impairment during Fite's performance of these tests. After Trooper Nance gave Fite instructions for the walk-and-turn test, he asked whether she needed them explained again, and she responded that she understood. [Doc. 48-5: Brooks BWC at 9:02:03]. Yet, when performing the walk-and-turn test, she needed the instructions reread halfway through the test. [Id. at 9:02:30].

12

Then, Trooper Nance gave Fite instructions for the one-legged-stand test, wherein he demonstrated how to hold her leg six inches off the ground (with the leg straight).  [Id. at 9:03:15]. While he was explaining the test, Fite practiced the technique, and she can be seen swaying on the video.  [Id. at 9:03:20 to 9:04:22].  Additionally, both while practicing and while performing the test, Fite failed to comply with instructions on how to hold her leg straightened; instead, she bent her knee.  [Id.].

After the tests were concluded, Trooper Nance informed Fite that she was going to be placed under arrest for driving while impaired and put her in his patrol car to transport her to a hospital for a blood draw.  [Doc. 48-5: Brooks BWC at 9:06:03-9:06:46].  Deputy Brooks did not see Fite again after her arrest and was no longer involved in the investigation beyond this point.  [Doc. 48-4: Fite Dep. at 90; Doc. 48-3: Nance Dep. at 213-14].  At that moment, Trooper Gantt can be seen in the background, and even further away, Trooper Adkins can be seen pulling up to the scene.  [Doc. 48-5: Brooks BWC at 9:09:21].

Trooper Adkins directed Trooper Nance to take Fite to the local hospital for a blood draw.  [Doc. 48-4: Fite Dep. at 152-53].  At the hospital, Fite told the officers that she also had taken a prescription diet pill, phentermine, the

13

day before. [Id. at 161-62]. Following the blood draw, Fite was taken down to the Magistrate's Office and charged with DWI. [Doc. 73-1: Citation].

When presenting the case to the Magistrate, Trooper Nance provided the citation, the rights form, and the Affidavit and Revocation Report ("Affidavit"). [Doc. 48-3: Nance Dep. at 33-34]. In the Affidavit, Trooper Nance stated as follows:

> [Fite] was driving a school bus for Union Elementary School. Deputy Brooks stepped onto the bus that [Fite] was driving and smelled a strong odor of alcohol coming from the breath. [Fite] admitted to drinking the night before & stated she took a few pills.

[Doc. 45-4: Affidavit]. The Affidavit did not disclose what type of pills that Fite had told the officers she had taken the day before, and Trooper Nance did not otherwise convey to the Magistrate what specific pills that Fite had taken. [Id.; Doc. 48-3: Nance Dep. at 165-66]. Trooper Nance's Affidavit also did not disclose that two consecutive PBTs were administered to Fite and that the results of both tests were 0.0, showing no blood alcohol concentration whatsoever. [Doc. 45-4: Affidavit; Doc. 48-3: Nance Dep. at 161]. Trooper Nance did not otherwise communicate to the Magistrate the results of the PBTs. [Id. at 164]. The Magistrate had the opportunity to ask questions of both Fite and Trooper Nance, but did not do so. [Id. at 202].

14

On or before December 19, 2021, Trooper Nance was instructed by one of his supervisors to speak with the District Attorney's Office about additional charges. [Doc. 48-3: Nance Dep. at 166-67]. The District Attorney's Office instructed Trooper Nance to take out additional charges for Misdemeanor Child Abuse and Misdemeanor Neglect, and Trooper Nance did so. [Doc. 73-2: Criminal Summons].

On April 7, 2022, the North Carolina State Crime Laboratory issued its report on Fite's blood draw, finding only phentermine in Fite's system. [Doc. 65: NC State Crime Lab Report]. After receiving this report, the Cleveland County District Attorney's Office dismissed Fite's criminal charges related to this incident. [Doc. 48-4: Fite Dep. at 115-16].

## IV. DISCUSSION

### A. Federal Claims

To state a claim under § 1983, a plaintiff must allege that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999). Here, Fite asserts claims under § 1983 against all three Defendants for malicious prosecution, unlawful seizure, and failure to intervene arising from her arrest on December 9, 2021. She also asserts § 1983 claims against Trooper

Nance for malicious prosecution and unlawful seizure arising from the charges lodged against her on December 19, 2021, and for fabrication of evidence in his presentation to the Magistrate. The Court will address each of these claims in turn.

### 1. Malicious Prosecution and Unlawful Seizure/Failure to Intervene

The Fourth Amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; see generally Graham v. Connor, 490 U.S. 386, 396 (1989). Because an arrest amounts to a Fourth Amendment seizure, probable cause is necessary for an arrest to be lawful. See Henderson v. Simms, 223 F.3d 267, 271 (4th Cir. 2000); see also Draper v. United States, 358 U.S. 307, 310-11 (1959).

Probable cause to justify an arrest means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979). Probable cause is determined

by a "totality-of-the-circumstances" approach.  Illinois v. Gates, 462 U.S. 213, 230 (1983).  "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict."  United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) (internal quotation marks omitted). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." Id.

A "malicious prosecution" claim under § 1983 "is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff."  Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000); accord Thompson v. Clark, 596 U.S. 36, 44 (2022).  Accordingly, to prevail on a claim for malicious prosecution and unlawful seizure under § 1983, a plaintiff must show that the defendant "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).

Here, the undisputed forecast of evidence demonstrates that the criminal proceedings terminated in favor of Fite.  Thus, the only issues that remain are (1) whether the Defendants "caused" a seizure of Fite and (2) if so, whether such seizure was supported by probable cause.

17

Turning to the first element, there does not appear to be any dispute that Deputy Brooks and Trooper Nance were both involved in the investigation and arrest of Fite and therefore "caused" her seizure. As for Trooper Adkins, however, the undisputed forecast of evidence demonstrates that he appeared on the scene only after Fite was arrested. He was not present when Trooper Nance conducted the PBTs or the field sobriety tests; he was not present when Trooper Nance arrested Fite; and he was not present when Trooper Nance took Fite before the Magistrate to complete the booking process. As such, no reasonable jury could conclude that Trooper Adkins "caused" Fite's seizure. Accordingly, the Plaintiff's § 1983 claim for malicious prosecution and unlawful seizure is dismissed as to Trooper Adkins.

The Court now turns to the seizure of Fite by Deputy Brooks and Trooper Nance and whether such seizure was supported by probable cause. To determine whether the officers are entitled to summary judgment on this issue, "the question is not whether there is a genuine dispute of material fact about whether probable cause existed, but rather whether there is a genuine dispute of material fact about what the officer[s] knew or reasonably believed at the time that could support a finding of probable cause." Harris v. Town of Southern Pines, 110 F.4th 633, 639 (4th Cir. 2024).

Here, viewing the facts in the light most favorable to the Plaintiff, there is no dispute of material fact as to what the officers knew or reasonably believed.  Deputy Brooks previously had received information regarding Fite's drinking late at night and smelling of alcohol during the workday. On the morning of Fite's arrest, Deputy Brooks observed four separate instances of Fite driving poorly.  While none of these incidents were egregious enough to cause her to initiate a traffic stop, they reasonably prompted Deputy Brooks to investigate further.  After Fite completed her bus route, Deputy Brooks boarded the bus to talk with Fite.  At that point, Deputy Brooks observed several indicators of possible impairment, including the odor of alcohol, Fite's unsteadiness on her feet, her leaning on the bus seats as if to hold herself up, several instances of slurred speech, and glassy eyes.[4] Beyond this, Fite denied that the children on the bus had misbehaved that morning, further increasing Brooks' suspicion that Fite's errant driving was due to some cause other than distraction from unruly children, such as intoxication.

Once in the principal's office and outside of the bus, Deputy Brooks continued to smell the odor of alcohol on Fite's person.  When confronted

---

[4] Deputy Brooks' observations are confirmed at least in part by the video of her interaction with Fite on the school bus, which depicts Fite leaning on the bus seats and slurring her words on occasion.

with these suspicions, Fite admitted that she had consumed six beers and then taken a Benadryl-type pill as a sleep aid the night before. When asked by Deputy Brooks whether she could still be intoxicated, Fite responded, "Honestly, I don't know."

Fite then chose to voluntarily resign her position at Cleveland County Schools apparently under the assumption that, if she resigned, she would not be required to submit to a breathalyzer. When explaining this decision, Fite stated that she did not want a record and did not want to go to jail. It was reasonable for Deputy Brooks to infer from Fite's decision to voluntarily resign and her statements about maintaining a clean record that Fite herself believed she was impaired.

At this stage in the investigation, Deputy Brooks had gathered the following articulable facts to show probable cause that Fite was intoxicated: four separate instances of errant driving behaviors, which were not the result of children misbehaving; prior reports of Fite drinking late at night and smelling of alcohol during the work day; an odor of alcohol coming from Fite's person[5]; unsteadiness on her feet and leaning on school bus seats; slurred

_____

[5] Fite argues that the results of the PBTs conclusively demonstrates that Deputy Brooks' report that Fite smelled of alcohol was simply wrong. [See Doc. 76 at 9]. However, the fact that the PBTs indicated that Fite had no alcohol in her system did not preclude the possibility that Fite still had an odor of alcohol on her person. As she admitted in her deposition, Fite woke up late and did not shower before coming to work.

speech; glassy eyes; an admission to drinking six beers the night before driving, as well as taking a pill as a sleep aid; when asked whether she could still be intoxicated, Fite responded, "Honestly, I don't know"; and her voluntary resignation of her job at Union Elementary, stating that she did not want to go to jail or have a criminal record.

Upon his arrival at the school, Trooper Nance independently noted the odor of alcohol on Fite, her slurred speech, her unsteadiness on her feet, and her glassy eyes, all of which had been previously noted by Deputy Brooks as well. Trooper Nance then administered the HGN test, during which he noted several clues of impairment.[6]

Trooper Nance then administered two PBTs, both of which registered 0.0. Fite argues that once the PBTs were administered and showed that she had no alcohol in her system, any probable cause developed to that point was "conclusively rebutted and proven to be false." [Doc. 76 at 11]. The PBT results, however, did not negate the possibility that Fite had driven the school bus with some alcohol in her system. Under North Carolina law, a

---

[6] In his deposition, Trooper Nance conceded that he did not hold the stimulus for a minimum of four seconds when administering the HGN test, as he had been trained to do. [Doc. 66-3: Nance Dep. at 76-78]. While the HGN test may not have been admissible in a subsequent criminal proceeding given this discrepancy, Trooper Nance's observation of nystagmus (involuntary jerking of the eyes) during the test, as well as Fite's own admission that her eyes were "bouncing" [Doc. 48-4: Fite Dep at 141], were relevant to the officer's probable cause analysis.

person is guilty of DWI if he or she operates a school bus while any amount of alcohol "remains in the person's body." See N.C. Gen. Stat. § 20-138.2B(a). Thus, a blood alcohol content as little as .0001 could constitute a violation. Here, the first PBT was administered at approximately 8:51 a.m., almost two hours after she began her bus route. Given her admission of drinking six beers and taking a sleep aid late in the evening prior, as well as the passage of time between her driving and the administration of the PBTs, it was not unreasonable for the officers to believe that alcohol may have "remain[ed] in [her] body" at the time that she was driving the bus. Moreover, given the indicators of impairment that she displayed, the negative PBT results did not eliminate the possibility that Fite was impaired by an intoxicant other than alcohol, such as drugs.

Based on the totality of the facts gathered by Defendants during their investigation the morning of December 9, 2021, Fite was placed under arrest for driving while impaired. She was subsequently charged on December 19, 2021 with additional violations for misdemeanor child abuse and misdemeanor neglect. Viewing these facts in combination with each other, it is clear that the officers had sufficient information to reasonably believe that Fite's arrest was supported by ample probable cause, and that there was a substantial chance she had in fact operated a school bus occupied with

22

children that morning with at least some alcohol or other intoxicant in her system. Because the forecast of evidence taken in the light most favorable to the Plaintiff clearly demonstrates that the Defendants had probable cause to support their arrest of the Plaintiff, no reasonable jury could find in her favor on her constitutional claims for malicious prosecution and unlawful seizure. Further, because the Court concludes that no reasonable jury could conclude that the officers lacked probable cause to arrest Fite on December 9, 2021 for driving while impaired, Fite's § 1983 claim based on the officers' alleged failure to intervene to prevent the violation of her constitutional rights must also be dismissed. See Johnson v. Baltimore Police Dep't, Nos. 22-2095, 22-2134, 2024 WL 1209744, at *6 (4th Cir. Mar. 21, 2024).

Because Fite has not presented a forecast of evidence that any Defendant violated her constitutional rights with respect to her seizure, the Defendants are also entitled to qualified immunity. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the

time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (citation and internal quotation marks omitted).  As such, summary judgment for the Defendants would also be proper on this ground.

## 2. Fabrication of Evidence

"To succeed on a Fourteenth Amendment fabrication of evidence claim, a plaintiff must show (1) that the officer fabricated or omitted material evidence; (2) that [the plaintiff] suffered a loss of liberty; and (2) that the loss of liberty was caused by the fabricated evidence." Harris v. Town of Southern Pines 110 F.4th 633, 645 n.6 (4th Cir. 2024).

In support of her fabrication claim, Fite relies primarily on three alleged misrepresentations or omissions in Trooper Nance's presentation to the Magistrate.  First, she argues that Trooper Nance materially misled the Magistrate by stating that Fite had the odor of alcohol on her and that she had admitted to drinking the night before when Trooper Nance knew that the results of the PBTs showed that Fite had no alcohol in her system. Further, Fite argues that Trooper Nance materially misrepresented her previous statements by advising the Magistrate that the Plaintiff had admitted to "taking a few pills."

As for Trooper Nance's statements regarding Fite's alcohol consumption, these were not misrepresentations.  Deputy Brooks had

reported a strong smell of alcohol on Fite, and Trooper Nance made the same observation while conversing with Fite in the principal's office. Further, Fite had admitted to drinking six beers the night before. Thus, Trooper Nance's statements in this regard were entirely factual and not misleading. Furthermore, while Trooper Nance did not advise the Magistrate of the PBT results, such omission was not material. As noted *supra*, the PBTs were administered almost two hours after she had started driving the bus and therefore it was not unreasonable for the officers to suspect that whatever amount of alcohol that was in her system had already dissipated by the time that she was subjected to the breathalyzer tests. As previously noted, under North Carolina law, *any* amount of alcohol in Fite's system at the time that she was driving the bus would have constituted a criminal offense. Fite admitted to drinking six beers and taking a sleep aid a few hours before she began driving a school bus full of children. She further admitted that she did not know whether she still had alcohol in her system, and she tendered her resignation from the school in an effort to avoid being subjected to a breathalyzer test. Given these undisputed facts, Trooper Nance's presentation of facts to the Magistrate did not rise to even a misleading representation, much less a fabrication.

As for Trooper Nance's statement regarding Fite "taking a few pills," the Plaintiff has failed to present a forecast of evidence from which a jury could conclude that this constituted the fabrication of evidence. While in the principal's office, Fite admitted to taking a generic form of Benadryl as a sleep aid, immediately after consuming six beers. Later, during the blood draw at the hospital, she admitted to having additionally taken a prescription diet pill the day before. Given Fite's own statements, it was not inaccurate for Trooper Nance to convey to the Magistrate that Fite had admitted to taking a "few" pills.[7]

In sum, the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude Trooper Nance fabricated or omitted material evidence in his presentation to the Magistrate. Because the Plaintiff has not presented a forecast of evidence that Trooper Nance violated her constitutional rights, the Defendant is also entitled to qualified immunity. As such, summary judgment for Trooper Nance would also be proper on this ground.

---

[7] Fite contends that this statement was nevertheless misleading because "there was a difference between the medicine consumed by Plaintiff and illicit drugs." [Doc. 63-1 at 17]. A legal substance, whether prescribed or over-the-counter, can still be impairing, especially when combined with an excessive amount of alcohol. Thus, Trooper Nance's failure to identify what types of pills that Fite had consumed does not constitute a fabrication or material omission of potentially exculpatory evidence.

## B. State Law Claims

### 1. False Arrest

In Count V of the Second Amended Complaint, Fite asserts a claim of false arrest under North Carolina state law against Defendants Brooks, Nance, and Adkins arising from Fite's arrest on December 9, 2021. Probable cause, however, "is an absolute bar to a claim for false arrest." Adams v. City of Raleigh, 245 N.C. App. 330, 335, 782 S.E.2d 108, 112 (2016) (citation omitted). As the Court has determined that the undisputed forecast of evidence establishes sufficient evidence for the officers' determination of probable cause for Fite's arrest and the Plaintiff has failed to present a genuine issue of material fact as to what those officers knew or reasonably believed, Fite's state law false arrest claim is dismissed.

### 2. Willful and Wanton Misconduct

In Count VI, Fite asserts a claim for "willful and wanton misconduct" against Defendants Brooks, Nance, and Adkins. North Carolina law, however, does not recognize a claim for "willful and wanton misconduct." See Arroyo v. Merriweather, No. 3:20-CV-00506-FDW-DSC, 2021 WL 2187947, at *5 (W.D.N.C. May 28, 2021).

To the extent that Fite is attempting to assert a claim of gross negligence, this claim also fails. "Gross negligence" is defined as "wanton

conduct done with conscious or reckless disregard for the rights and safety of others." Higgins v. Mendoza, 910 S.E.2d 920, 923 (N.C. Ct. App. 2025) (citation and internal quotation marks omitted). "[A]n act is wanton when it is done with wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Parish v. Hill, 350 N.C. 231, 239, 513 S.E.2d 547, 551-52 (1999) (citation and internal quotation marks omitted).

Here, Fite has failed to present any forecast of evidence from which a jury could reasonably conclude that any of the Defendants acted with a "wicked purpose" or a "conscious or reckless disregard" for her rights. Thus, Fite cannot satisfy the elements of a gross negligence claim.

Moreover, under North Carolina law, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." Hunter v. Transylvania Cty. Dep't of Soc. Servs., 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (2010). Here, Fite has failed to present a forecast of evidence that any of the Defendants acted maliciously, corruptly, or outside

28

the scope of their official authority in their interactions with her. Moreover, Fite's "mere allegations of gross negligence cannot defeat [public official] immunity." Bishop v. County of Macon, 620 F. App'x 148, 150 (4th Cir. 2015); Shaw v. Stroud, 13 F.3d 791, 803 (4th Cir. 1994). For these reasons, the Defendants are entitled to public official immunity with respect to Fite's claim of gross negligence as well.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that there are no genuine disputes of material fact and that the Defendants are entitled to a judgment as a matter of law.

## O R D E R

**IT IS, THEREFORE, ORDERED** that:

(1)    The Plaintiff's Motion for Partial Summary Judgment [Doc. 63] is **DENIED**;

(2)    Defendant Brooks' Second Motion for Summary Judgment [Doc. 66] is **GRANTED**;

(3)    The Motion for Summary Judgment filed by Defendants Nance and Adkins [Doc. 69] is **GRANTED**; and

(4)    The Plaintiff's Second Amended Complaint is **DISMISSED WITH**

**PREJUDICE**.

A Judgment consistent with this Memorandum of Decision and Order

shall be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: August 6, 2025

Martin Reidinger
Chief United States District Judge